UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

THE ESTATE OF MATTHEW MR. PLANER, a deceased individual; DEBORAH WILLIAMS, personal representative of the Estate of Matthew Mr. Planer and heir of Matthew Mr. Planer,

Plaintiffs,

v.

CITY OF POCATELLO; CHIEF ROGER SCHEI; SERGEANT RICH SERGEANT SAMPSON; OFFICER BREYVON JOHNSON,

Defendants.

Case No. 4:24-cv-00284-BLW

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

Before the Court are the cross motions for summary judgment filed by Plaintiffs—the Estate of Matthew Planer and Deborah Williams, the personal representative of the estate and heir of Mr. Planer—and Defendants, the City of Pocatello, Chief Roger Schei, Sergeant Rich Sampson, and Officer Breyvon

Johnson. (Dkts. 25, 26).[1] Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary. For the reasons stated below, the Court grants in part and denies in part both motions.

## BACKGROUND

This case stems from the fatal shooting of Matthew Planer by Sergeant Rich Sampson of the Pocatello Police Department. In considering each motion, the facts are presented in the light most favorable to the non-moving party. However, for the purposes of summary judgment, the Court "may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (emphasis original).

On January 27, 2023, Sergeant Sampson and Officer Johnson responded to a disturbance call at an apartment building located at 729 W. Center Street, Pocatello, Idaho. Cmpl. ¶ 19 (Dkt. 4). Sergeant Sampson had been a Pocatello police officer since 2002, and a sergeant since 2022. Sampson Dep. 6:24-8:3 (Dkt. 27-1). Officer Johnson had been a Pocatello police officer since April 2022. Johnson Dep. 9:1-4 (Dkt. 27-2). On January 27, 2023, both officers were POST-certified. *Id*. at 10:1-7; Sampson Dep. 13:4-14:6.

---

[1] Plaintiffs filed a motion for partial summary judgment, only on their Fifth, Sixth, Seventh, Eighth, and Nineth Causes of Action.

The entirety of the incident was captured on Sergeant Sampson's body-worn camera ("BWC") Pls.' Mem. Supp. Summ. J. Exs. D, E (Dkts. 27-4, -5). Officer Johnson's BWC captured the incident from arrival at the apartment building, until shortly after the officers first contacted Mr. Planer, when Officer Johnson then exited the building to go and write a citation in his vehicle, and then when Officer Johnson returned upon hearing the shot fired. *Id*. at Exs. F, G (Dkts. 27-6, -7).[2]

Officer Johnson's recording begins as he enters the building and knocks on the door of Unit 108, on the first floor. Dkt. 27-6 at 0:00-0:33. When he does not receive a response, he knocks again and identifies himself as Officer Johnson of the Pocatello Police Department. *Id*. at 1:08-1:16. Sergeant Sampson arrives on the scene and joins Officer Johnson. Dkt. 27-4 at 0:01. Both Officer Johnson and Sergeant Sampson can be seen on each other's cameras wearing a jacket with a badge, a Pocatello Police patch, and a nametag, a Pocatello Police Department baseball cap, a radio and earpiece, a service belt, and a body camera. *Id*. at 0:48; Dkt. 27-6 at 3:17. E. Idaho Critical Incident Team Supp. Rep. (Dkt. 27-9 at 15,

[2] Both parties provided the Court with the officers' BWC footage as exhibits by mailing in USB drives. The Court will cite to the version provided by Plaintiffs to maintain consistency with other cites to the record. Plaintiffs provided four files, while Defendants provided five files. Defendants' fifth file is an additional three minutes of Officer Johnson's recording that, without any accompanying audio, shows him outside the apartment while other officers and paramedics respond, then exiting the building and walking down the street to another police vehicle. This footage does not capture any events relevant to the parties' motions that is not also captured by Sergeant Sampson's BWC.

100).

A woman approaches the officers, states that "this guy is out of control, he just moved into [Unit] 301," and shows the officers a picture she took of the man. Dkt. 27-6 at 4:00-4:09. This woman was the reporting party who had called 911. Sampson Dep. 82:3-23 She informs the officers that she lives in Unit 304, next door to the man. Dkt. 27-6 at 4:29-4:44. She states that the man was screaming obscenities and grabbed her phone. *Id*. at 4:20-4:28. On the way up the stairs, she claims that "he is drunk or on drugs" and so she took his picture.[3] *Id*. at 4:50-4:58. The man was Mr. Planer.

The officers climb two sets of stairs to the third floor. *Id*. at 4:50-5:30. In order to reach Unit 301 from the stairs, the officers had to make a 180-degree turn and walk down a narrow hall next to the staircase. *Id*. at 5:30-5:37.

[3] There is no evidence establishing whether Mr. Planer was in fact intoxicated. Sergeant Sampson, in an interview with the Eastern Idaho Critical Incident Team on February 1, 2023, stated that he believed Mr. Planer was impaired in some way. Dkt. 27-9 at 104.




*Figure 1 - Sgt. Sampson pictured by the third floor landing.*




*Figure 2 - Sgt. Sampson approaching Units 301 and 302 after making the 180-degree turn. The stairwell is to the right.*

The officers walk through a doorway, and come to the end of the hall, where the doors to Units 301 and 302 are located. *Id*. at 5:38. Calculations performed by Matthew Bloodgood, Defendants' expert witness, determined that the distance from the doorpost of Unit 302 nearest to the end of the hallway to that hallway end was approximately five to five and one-half feet. Expert Rep. of Matthew Bloodgood at 46 (Dkt. 25-4 at 52).[4]




*Figure 3 - Sgt. Sampson walking through the doorway towards the doors of Units 301 and 302.*

The two officers approach Unit 301 together. Dkt. 27-6 at 5:40. Sergeant

[4] Plaintiffs have filed a motion to strike Bloodgood's report. Dkt. 33. As of the time of writing, that motion is pending. For the purposes of summary judgment, the Court only considers the report for the calculations performed by Bloodgood, which Plaintiffs did not challenge in their motion.

Sampson knocks on the door. *Id*. Shortly after he knocks, the woman reaches the third floor and continues to tell the officers about her confrontation with Mr. Planer. *Id*. at 6:06. Officer Johnson turns and walks away from Unit 301 and walks back down the hallway to talk to her. Dkt. 27-4 at 3:38. Sergeant Sampson knocks on the door again, after approximately twenty-five seconds without a response. *Id*. at 3:44. Officer Johnson talks with the woman, who states that Mr. Planer took her phone out of her hands and threatened to break it. Dkt. 27-6. at 6:06-7:11 He evidentially handed the phone back at some point, as the woman is holding it on both officers' BWC recordings.

On Officer Johnson's footage, a loud, unintelligible voice can be heard, which the woman identifies as Mr. Planer. *Id*. at 6:34-6:50. The voice can be heard on Sergeant Sampson's recording as well. Dkt. 27-4 at 4:04-4:20. Sergeant Sampson knocks on Unit 302 and announces "police department." *Id*. at 4:25-4:30. Unit 302 is on the opposite side of the hall from Unit 301. *Id*. "Go away" can be heard from the other side of the door. *Id*. At roughly the same time, the woman tells Johnson that she wants Mr. Planer arrested for grabbing her phone. Dkt. 27-6 at 6:55-7:06. Sergeant Sampson can be heard making contact with Mr. Planer while Johnson continues to speak with the woman. *Id*.

Mr. Planer opens the door to Unit 302 roughly halfway. Dkt. 27-4 at 4:33. A portion of the apartment's interior is visible from the footage. A sink containing a

large pot is immediately next to the door, on Sergeant Sampson's right and Mr. Planer's left. In his interview with the Eastern Idaho Critical Incident Team on February 1, a few days after the shooting, Sergeant Sampson stated that he saw a pot with a large kitchen knife in it when he first contacted Mr. Planer, but did not draw attention to it. E. Idaho Critical Incident Team Supp. Rep. (Dkt. 27-9 at 101).




*Figure 4 - A view from Sgt. Sampson's BWC of the interior of Unit 302, Mr. Planer's apartment. The sink and the pot are visible.*

Sergeant Sampson identifies himself as "Sergeant Sampson of the Pocatello Police" and asks if he can talk to Mr. Planer, but Mr. Planer declines. Dkt. 27-4 at 4:33-4:40. Sergeant Sampson steps forward or shifts his weight and says "we've got a bit of a situation with one of your neighbors, it sounds like." *Id*. at 4:40-4:47. Sergeant Sampson informs Mr. Planer that the woman is alleging Mr. Planer yelled

at her and grabbed her phone out of her hand. *Id*. at 4:48-4:51. Mr. Planer states that he did not, and that the woman was yelling at him—but he then admits that he may have grabbed her phone, though he "didn't mean to do that." *Id*. at 4:52-5:10.

During this initial conversation between Mr. Planer and Sergeant Sampson, Officer Johnson turns back around and proceeds down the hall to where Sergeant Sampson is standing. Dkt. 27-6. at 7:12-7:20. As he approaches, Sergeant Sampson is visible, standing at the doorway to Unit 302. *Id*. at 7:14. The doorway has a door sill, consisting of a metal plate capped with a black strip. *Id*. Sergeant Sampson's right foot is on the metal portion, and the front of his left boot is on top of the black strip. *Id*. The front of his left boot appears to be just beyond the strip, into the apartment. *Id*.




*Figure 5 – Sgt. Sampson in the doorway of Unit 302 as Ofc. Johnson returns after speaking with the woman.*

Sergeant Sampson informs Mr. Planer that he is conducting a criminal investigation, and Mr. Planer is required to identify himself. *Id*. at 5:10-5:21. He then requests Mr. Planer's identification. *Id*. at 5:21-5:31. Mr. Planer reaches into his pocket and pulls out several items and asks Sergeant Sampson why the police are here, who responds that they are conducting a criminal investigation. *Id*. at 5:32-5:48. He insults Officer Johnson's moustache while he continues to search for his ID. *Id*. at 5:48-6:15

Mr. Planer sets the stack of items from his pocket down on the far side of the sink, and states that, "I don't have my fucking ID, so go fuck yourself. You can go away, as well. You-you don't have to be here, and there's no reason for you to be

here." *Id*. at 6:15-6:26. Sergeant Sampson disagrees, and Mr. Planer loudly questions why the police are present. *Id*. at 6:27-6:34. Mr. Planer finds his ID, and Sergeant Sampson leans forward, to the point where the weather stripping and most of the door frame is no longer visible, to reach out and grab Mr. Planer's ID, who is holding it out to him. *Id*. at 6:34 Sergeant Sampson shifts back, as the weather stripping and door frame return to view. *Id*. at 6:39. Sergeant Sampson calls dispatch and relays the identifying information from the ID, and as he does so, Mr. Planer states "You can't come in here," and begins to close the door. *Id*. at 6:38-6:45. Sergeant Sampson stops the door with his left wrist while holding Mr. Planer's Identification. *Id*. at 6:45-6:54. Sergeant Sampson states "I'm not asking to come in." *Id*. Mr. Planer responds that "Yeah I know, but I'm closing the door. I'm closing the door. Get the fuck out of my way." *Id*. Mr. Planer closes the door, hitting Sergeant Sampson's left arm and causing Sergeant Sampson to take a step back. *Id*.

After the door closes, Sergeant Sampson turns to Johnson and says "At least we got him ID'd" before chuckling. *Id*. at 7:02-7:08. Dispatch evidently says something to both Sergeant Sampson and Officer Johnson, as Sergeant Sampson states, "that's a big 10-4," and both officers laugh. *Id*. at 7:18-7:23. Deposition testimony established that the statement was in response to advice from dispatch

that Mr. Planer was hostile to law enforcement. Sampson Dep. 102:15-22; Johnson Dep. 82:16-24.

Sergeant Sampson again knocks on the door to Planer's apartment, and Officer Johnson informs Sergeant Sampson that the woman wants charges pressed. Dkt. 27-6 at 9:52-9:57. Mr. Planer opens the door, and Sergeant Sampson says, "Hey," to which Mr. Planer responds with, "So, go fuck yourself." Dkt. 27-4 at 7:34-7:38. Sergeant Sampson informs Mr. Planer that he will be issued a citation for "what happened today." *Id*. at 7:38- 7:40. Mr. Planer asks what happened, and Sergeant Sampson states that, "what she's reporting happened, happened." *Id*. at 7:41-7:45.

Sergeant Sampson asks Mr. Planer if he wanted to come down to Officer Johnson's vehicle to collect the citation or wait in his apartment. *Id*. at 7:45-7:54. Mr. Planer states his intent to wait in his apartment, and Sergeant Sampson informs Mr. Planer that he will stay with him while Officer Johnson goes to his vehicle to write the citation. Id. at 7:51-8:03. Officer Johnson walks back towards the stairs and informs the woman that he will write Mr. Planer a citation. Dkt. 27-7 at 0:32-0:45.

Mr. Planer sits down just beyond the door and states that there was no incident, then requests his ID back, which Sergeant Sampson refuses. Dkt. 27-4 at 7:57-8:14. Mr. Planer again insists on getting his ID back. *Id*. at 8:15. Sergeant

Sampson responds, stating, "No, I'm going to hold onto it until we're done with the contact, and don't talk to me that way." *Id*. at 8:15-8:19. Sergeant Sampson significantly raises his voice over the course of his sentence. The two overlap, but Mr. Planer says "Shut the fuck up," while Sergeant Sampson says "Listen, listen to me, sir. I let you berate me, I let you shut the door in my face, I'm done with it. So, I want you to stop disrespecting me, because I have not been disrespectful with you once." *Id*. 8:19-8:31. As Sergeant Sampson says "berate me," Mr. Planer stands up and grabs the counter by the sink. *Id*. Mr. Planer begins to respond, but Sergeant Sampson shouts "Stop it! We're done." *Id*. at 8:31-8:33. Mr. Planer begins to say "Hey, listen, I'm sorry—" but Sergeant Sampson continues, at a lower volume, saying "No, we're done. I don't want to hear it, I don't want you to be disrespectful anymore, if you [unintelligible] listen to your mother's advice, if you can't say something nice, don't say anything at all. Be quiet, sit there, and don't say anything." *Id*. at 8:33-8:45.

Mr. Planer walks further into his apartment and puts on a hat, then states, "You know, I'm sorry that your dad was abusive to you." *Id*. at 8:45-8:50. Sergeant Sampson tells Mr. Planer not to discuss his parents, but Mr. Planer insists that Sergeant Sampson's father was abusive, while Sergeant Sampson maintains that he was not. *Id*. at 8:51-9:11. As Mr. Planer continues, Sergeant Sampson states that he is going to stay at the door until the citation is served. *Id*.

On Officer Johnson's BWC footage, Sergeant Sampson and Mr. Planer can be heard arguing with raised voices. Dkt. 27-7 at 0:42-1:36. Officer Johnson lingers at the stairwell landing, listening to Sergeant Sampson and Mr. Planer go back and forth, before heading down the two flights of stairs and out of the apartment building. *Id*. Officer Johnson begins to descend the stairs as Sergeant Sampson states that he was going to stay at the door until Officer Johnson serves the citation. *Id*. The woman is hiding behind a wall by the stairs while this is occurring. *Id*.

The conversation returns to a more normal volume. Mr. Planer continues apologizing that Sergeant Sampson was abused, and Sergeant Sampson acquiesces to Mr. Planer's statements as Mr. Planer puts on a jacket and grabs a pack of cigarettes and a lighter. Dkt. 27-4 at 9:12-9:27 Sergeant Sampson states that he is sorry that Mr. Planer has the attitude that he has. *Id*. at 9:31-9:36. When Mr. Planer inquires what that attitude is, Sergeant Sampson states that "You're a jerk." *Id*. at 9:37-9:42. Mr. Planer states that he is actually a nice guy, and Sergeant Sampson responds that he disagrees. *Id*. at 9:42-9:55.

Mr. Planer asks Sergeant Sampson if he is from Idaho, and Sergeant Sampson responds that he is. *Id*. at 9:57-10:00; Dkt. 27-5 at 0:01-0:02. Mr. Planer then walks further back into the apartment, then returns to the door, stating that Sergeant Sampson is "just like all these people here. You're not a very nice

person." Dkt. 27-5 at 0:02-006. At that point, Mr. Planer is holding onto the edge of the door with his right hand. *Id*. at 0:06. Sergeant Sampson states that he disagrees. *Id*. at 0:06-0:08.

Mr. Planer states, "You know, I hate this fucking town." *Id*. at 0:08-0:10. Sergeant Sampson and Mr. Planer crosstalk. Mr. Planer says, "I hate all of the people here," while Sergeant Sampson says, "Well you know what you should do? You should move." *Id*. at 0:10-0:13. Mr. Planer lets go of the door, stands, facing towards the sink, and brings his hands together, moving the cigarette and lighter into his right hand. *Id*. at 0:13-0:14. Sergeant Sampson begins to say, "If you don't like it you should—" as Mr. Planer reaches into the pot in the sink. *Id*. at 0:14-0:15. Mr. Planer pulls a knife out of the pot with his left hand, raising it to roughly shoulder level. *Id*. at 0:15-0:16. As Mr. Planer pulls the knife out, Sergeant Sampson gasps and quickly steps back. *Id*. The door to Unit 302 opened into the apartment, and would arc from right to left as it opened. Sergeant Sampson was positioned so that he was standing with his back facing the end of the hallway.

Sergeant Sampson says "motherfucker" before drawing his gun and firing a single shot. *Id*. at 0:15-17. Almost exactly as Sergeant Sampson draws and fires, Mr. Planer appears to drop the knife back into the sink. *Id*. Mr. Planer grabbing and raising the knife and Sergeant Sampson firing the shot occur within approximately two seconds. *Id*. It is unclear from the video if Mr. Planer made any movement

towards Sergeant Sampson. *Id*. Mr. Planer's feet do not appear to move, and it is unclear if Mr. Planer leaned his upper body forward. *Id*.

Mr. Planer staggered back into the apartment and fell prone by the back wall. *Id*. at 0:17-0:22. Sergeant Sampson, with his gun still drawn, radioed dispatch, "Pocatello 52-10, shots fired, I've got one male down. He pulled a knife on me." *Id*. at 0:23-0:30. Sergeant Sampson twice ordered Mr. Planer to put his hands behind his back, before holstering his weapon. *Id*. at 0:38-0:51.

Officer Johnson was across the street in the driver's seat of a parked police vehicle, preparing to write the citation. Dkt. 27-7 at 1:59-2:24. As he entered the vehicle, Officer Johnson muted his camera. *Id*. at 2:19. The remainder of his recording has no sound. Approximately one minute and fifteen seconds after he began to descend the stairs, and approximately thirty-three seconds after he entered the vehicle, Officer Johnson rushes out, back across the street, into the apartment building, and up the two flights of stairs. *Id*. at 2:52-3:18.

When Officer Johnson reaches the doorway, Sergeant Sampson is standing inside the apartment, and Mr. Planer is lying prone, near the far wall. *Id*. at 3:18. The two drag Mr. Planer away from the wall and handcuff him. Dkt. 27-5 at 0:54-1:09. The officers roll Mr. Planer over. *Id*. at 1:09-1:16. A large bloodstain is visible on Mr. Planer's shirt and on the floor. *Id*. Sergeant Sampson radios dispatch that there is a gunshot wound to the chest, and Johnson begins chest compressions

while Sergeant Sampson manages Mr. Planer's airway. *Id*. at 1:16-2:47. Other Pocatello police officers arrive on the scene and find their way to Unit 302 approximately fifty seconds after Sergeant Sampson radioed dispatch. *Id*. at 2:17. Sergeant Sampson hands a chest seal to the first officer that arrived, and the officers pull up Mr. Planer's shirt to place the seal on a bullet hole above Mr. Planer's right pectoral. *Id*. at 2:47-3:14. As more officers arrive and take over chest compressions, Sergeant Sampson states Mr. Planer "pulled a knife on me at the sink when I was at the door with him." *Id*. at 3:14-3:34.

Other officers take over, as Sergeant Sampson exits the unit and stands in the hallway. *Id*. at 4:09-5:36. Sergeant Sampson speaks with another officer, who asks, "Just the protocol, right? One round, from, were you in the door?" *Id*. at 5:36-5:44. Sergeant Sampson walks over to outside of the doorframe, and states, "Yeah, I was standing right—I was standing right here. He pulled a knife, um, he pulled a knife on me out of the sink, um, and when he—when he brought it up, I [unintelligible] delivered one round into his chest so the round went that direction," gesturing into the apartment. *Id*. at 5:44-6:00. Sergeant Sampson walked out of the apartment complex and met up with another officer and began to walk down the street to get into a car and return to the police station. *Id*. at 6:00-7:42. Sergeant Sampson announced he was turning off his camera and then requested that the other officer do it for him. *Id*.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is

not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

## ANALYSIS

### A. Plaintiffs' State Law Claims are Dismissed, as the Evidence does not Demonstrate a Genuine Dispute Regarding Defendants' Statutory Immunity

Plaintiffs assert claims under Idaho law for wrongful death, negligence, negligent entrustment, and battery in their First, Second, Third, and Fourth Causes of Action. Cmpl. ¶¶ 85-117. These claims must be decided in favor of Defendants, as Plaintiffs have not presented evidence of a disputed issue of fact which would preclude dismissing the claim against Sergeant Sampson on grounds that he is statutorily exempt from liability.

The Idaho Tort Claims Act ("ITCA"), codified at Title 6, Chapter 9 of the Idaho Code, provides that a governmental entity is generally liable for the negligent or wrongful acts of its employees acting within the course and scope of

their employment if a private person would be liable for such acts under state law. I.C. § 6-903(1). However, the ITCA does provide a carveout in § 6-904. This section states that:

> a governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
> . . .
> 3. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

I.C. § 6-904.

The ITCA "precludes a claim against a government employee, regardless of legal theory, if the claim stems or originates from conduct enumerated under § 6-904(3)." *Hall v. McClure*, 2024 WL 3696114 at *10 (D. Idaho Aug. 7, 2024). Additionally, government employees enjoy a "rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment and without malice or criminal intent." I.C. § 6-903(5). It is not determinative whether or not Plaintiffs actually allege any of the listed torts, because the statute requires only that a tort claim originates or stems from the conduct listed. *James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2015). Federal courts in Idaho have concluded that § 6-904(3) applies in wrongful death cases. *See Blackhawk v. City of Chubbuck*, 488 F. Supp. 2d 1097, 1102-03 (D. Idaho 2006).

In order to survive summary judgment, Plaintiffs "must point to some evidence—beyond, simply, the allegations contained in [the] Complaint—that [Defendants] acted maliciously or with criminal intent. *Bates v. Yammamoto*, 2014 WL 3881975 at *9 (D. Idaho Aug. 7, 2014).

Neither party disputes that Sergeant Sampson was acting within the course and scope of his employment. Nor do Plaintiffs argue that Sergeant Sampson acted with criminal intent. Plaintiffs must therefore provide evidence to demonstrate that Sergeant Sampson acted with malice. Malice, as used in the ITCA, is "the intentional commission of a wrongful or unlawful act, without legal justification or excuse and with *ill will*, whether or not the injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 182 (Idaho 1986) (emphasis original).

Plaintiffs have not provided any evidence that would demonstrate the existence of a factual issue that "may reasonably be resolved in favor of either party." *Liberty Lobby*, *Inc.*, 477 U.S. at 249. Plaintiffs point to three actions they allege sufficiently evince that Sergeant Sampson acted with malice. These are (1) continuing to engage with Mr. Planer despite knowledge that Mr. Planer was hostile towards law enforcement; (2) unlawfully entering Mr. Planer's home and seizing him; and (3) verbally berating Mr. Planer, including calling him a "motherfucker" immediately before shooting him. None of these actions are

sufficient to overcome the presumption that Sergeant Sampson acted without malice.

The fact that the officers continued to engage with Mr. Planer, even after dispatch advised them of his hostility towards law enforcement, is not a wrongful or unlawful act. Nor is there evidence that it was done with ill-will. The officers were investigating a disturbance, and had been met by the alleged victim, who stated that Mr. Planer had shouted obscenities at her and took her phone. The fact that the officers purposefully continued an interaction with an individual who had demonstrated an adversarial attitude did not lead to a peaceful resolution, but there is no evidence in the record to create a genuine dispute that the officers acted wrongfully, unlawfully, or with ill-will.

The Court will discuss Plaintiffs' allegations that Sergeant Sampson unlawfully entered Mr. Planer's home and seized him in the next section of this decision. However, for the purposes of the ITCA, an officer unlawfully entering and seizing an individual in their home is not enough to demonstrate a genuine dispute of fact as to whether Sergeant Sampson's conduct was malicious. *See Ludwig v. City of Pinehurst*, 2024 WL 4124190 at *1, *4 (D. Idaho Sep. 9, 2024) (plaintiffs failed to provide evidence that police officer blocking individual from closing home door was malicious); *Barber v. City of Idaho Falls*, 2016 WL 817286 at *3 (Idaho Ct. App. Mar. 2, 2016) (plaintiff's claims, including that a police

officer entered his home without permission, were insufficient to rebut I.C. § 6-903(5) presumption).

Finally, the parties spar over whether Sergeant Sampson's utterance of "motherfucker" was a startled response, or was an insult levelled at Mr. Planer, chosen instead of providing Mr. Planer with a warning that Sergeant Sampson would use lethal force. The video footage is evidence enough that Plaintiffs cannot rebut the § 6-903(5) presumption on this point. Sergeant Sampson does not use any profanity up until that moment. Just before Mr. Planer grabs the knife, Sergeant Sampson is in the middle of a sentence, telling Mr. Planer that he should move if he hates Pocatello so much. At this stage, both Mr. Planer and Sergeant Sampson had returned to normal conversational volume. As Sergeant Sampson sees Mr. Planer grab the knife, Sergeant Sampson cuts himself off with a gasp, before moving back, uttering "motherfucker," and firing, all within less than two seconds. Even viewing the video in a light most favorable to Plaintiffs, the evidence does not support the argument that this was a malicious action before Sergeant Sampson pulled the trigger. Rather, the footage demonstrates it to be a near-involuntary, shocked utterance.

Sergeant Sampson is, as a matter of law, exempt from liability on Plaintiffs' state law claims. Chief Schei and the City of Pocatello are therefore not vicariously

liable. *See Miller v. Idaho State Patrol*, 252 P.3d 1274, 1289 (Idaho 2011). Nor are they liable for negligent entrustment.

**B. Sergeant Sampson did not Use Excessive Force**

Plaintiffs' Seventh Cause of Action alleges unlawful seizure and excessive use of force, in violation of the Fourth and Fourteenth Amendments. A police officer's use of deadly force against a person constitutes a seizure within the meaning of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

A claim that a law enforcement officer used excessive force during an investigatory stop or other seizure is analyzed under the Fourth Amendment objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388, 394 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. This same standard applies in a claim of excessive force. *Id*. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (quotations and citations omitted).

Assessing the reasonableness of Sergeant Sampson's conduct requires balancing the nature and quality of the intrusion on Mr. Planer's Fourth Amendment rights against the government's countervailing interest in the force

used. *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (citing *Graham*, 490 U.S. at 396).

"Deadly force is the most severe intrusion on Fourth Amendment interests because an individual has a 'fundamental interest in his own life' and because, once deceased, an individual can no longer stand trial to have his 'guilt and punishment' determined." *Id*. (quoting *Garner*, 471 U.S. at 9).

In considering the government's countervailing interest in the use of force, there are three core factors which must be considered, and which require a "careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396. These are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. "The most important of these factors is whether the suspect posed an immediate threat to the safety of the officers or others." *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024) (quotations and citations omitted).

The severity of the crime weighs in the government's favor. Although at first the officers were only investigating a disorderly conduct case—a misdemeanor in Idaho., I.C. § 18-6409—the calculus changed when Mr. Planer brandished the

knife. In doing so, Mr. Planer arguably committed aggravated assault [5]. *See Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 919 (9th Cir 2024) (act that may have been assault with a deadly weapon under Nevada law sufficient to weigh factor in government's favor). Considering the facts and circumstances known to Sergeant Sampson, while the initial crime at issue may not have weighed in the government's interest, subsequent actions by Mr. Planer shifted that balance in its favor. *See S. R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (Ninth Circuit has used severity of the crime at issue "as a proxy for the danger a suspect poses at the time force is applied"); *see also Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012) ("the police did not contend that [defendant was] committing a crime at the time he was shot.")

The next factor to be considered, whether Mr. Planer was resisting or evading arrest, has only limited utility here. Sergeant Sampson never tried to arrest

---

[5] Aggravated assault is defined as "an assault: (a) With a deadly weapon or instrument without intent to kill . . . ." I.C. § 18-905. Assault, in turn is:

> (a) An unlawful attempt, coupled with apparent ability, to commit a violent injury on the person of another; or
>
> (b) An intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent."

I.C. § 18-901. For the purposes of the statute, a knife is considered a deadly weapon. *State v. Cudd*, 51 P.3d 439, 441 (Idaho Ct. App. 2002).

Mr. Planer, meaning he never resisted arrest. Nor did Mr. Planer ever try to actively evade arrest by flight. Although the conversation between the two was argumentative and confrontational, Mr. Planer never physically resisted. Nor did he give any physical indication that he would resist up until the point that he grabbed a knife.

The final, and most important, factor—whether Mr. Planer posed an immediate safety threat—weighs heavily in the government's favor. Mr. Planer, without warning, grabbed and raised a knife while standing only four to five feet away from Sergeant Sampson. Expert Report of Matthew Bloodgood at 51 (Dkt. 25-4 Ex. A at 57); *Cf S. R. Nehad*, 929 F.3d at 1134 (lethal force not reasonable when decedent did not say anything, was walking towards officer but was seventeen feet away, did not make any sudden movements, and did not move the alleged knife). Sergeant Sampson was standing at the end of the hallway with his back approximately five to five and one-half feet from a wall. Rep. of Matthew Bloodgood at 46. Mr. Bloodgood cites research that individual with a knife can perform a step and stab or slash across six feet in 0.33 seconds. *Id*. at 40. Mr. Bloodgood concluded that, even if Sergeant Sampson had retreated as far back as he could before hitting the wall, Mr. Planer could have closed the distance in 0.85-0.95 seconds. *Id*. at 72.

A police officer "may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). An immediate threat might be indicated by "a furtive movement, harrowing gesture, or serious verbal threat." *George v. Morris*, 738 F.3d 829, 838 (9th Cir. 2013). This is not a case where Mr. Planer was simply holding a knife. Mr. Planer's sudden, unexpected grabbing and raising of the knife up to shoulder level, standing only four to five feet from Sergeant Sampson, unquestionably qualifies as a harrowing gesture.

Plaintiffs also emphasize that Sergeant Sampson did not provide any warning prior to shooting Mr. Planer. Generally, an officer must give a warning before using deadly force whenever practicable. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014). However, the absence of a warning does not automatically mean that the use of deadly force is unreasonable. *Id*. at 797.

A warning by Sergeant Sampson was not practicable. Sergeant Sampson was only a few feet away from an individual who suddenly, without warning, brandished a knife. Sergeant Sampson was positioned on the side of the doorway closest to the end of a hallway. He only had limited space in which to retreat, and as discussed earlier, Mr. Planer could have covered that distance in less than a second. If Sergeant Sampson attempted to retreat, he would have to cross the

doorway, bringing himself closer to Mr. Planer. It would be unreasonable to expect that Sergeant Sampson first warn Mr. Planer under those circumstances.

Because of the significant immediate threat that Mr. Planer posed for Sergeant Sampson, the balancing test weighs strongly in favor of the government's interest in the use of force. Examining the threat to safety that Sergeant Sampson perceived, in light of the facts and circumstances that he was confronted with, demonstrates that Sergeant Sampson acted objectively reasonably. There are simply no disputed issues of fact which could lead to a different conclusion.

### C. Sergeant Sampson Unlawfully Seized Mr. Planer

Plaintiffs' Fifth and Sixth Causes of Action are allegations of unlawful seizure in violation of the Fourth and Fourteenth Amendments. The Fifth Cause of Action concerns Plaintiffs' allegation of Sergeant Sampson's initial entry into Mr. Planer's doorway. The Sixth Cause of Action concerns the second contact with Mr. Planer, when he opened his door back up to Sergeant Sampson, and, as Plaintiffs allege, Sergeant Sampson again entered the doorway.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A seizure occurs when an officer in some way restricts the liberty of a person, through coercion, physical authority, or a show of authority. *U.S. v. Washington*, 387 F.3d 1060, 1068 (9th

Cir. 2004). "A person's liberty is restrained when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id*. (citations omitted).

**1. The Seizure**

The evidence demonstrates that there is no genuine dispute that Sergeant Sampson entered Mr. Planer's apartment. During the officers' first interaction with Mr. Planer, Sergeant Sampson can be seen on Officer Johnson's BWC with a portion of the front of his boot within the door threshold. When Mr. Planer first attempts to close the door, Sergeant Sampson blocks it with his forearm. Given that the door swung inward when opened, into Mr. Planer's apartment, Sergeant Sampson's arm would have been inside the apartment to block the door.

A writeup of Officer Johnson's interview with the Eastern Idaho Critical Incident Team records that "While [Sergeant] Sampson was providing [Mr. Planer's] information to dispatch [Mr. Planer] slammed the door. [Sergeant] Sampson had to move out of the way to prevent from getting hit." E. Idaho Critical Incident Team Supp. Rep. (Dkt. 27-9 at 17). Sergeant Sampson, in his interview, stated that he never entered the threshold of the apartment itself, but also recounted that the door pushed against the brim of his baseball cap when Mr. Planer closed it. *Id*. at 102-03. The undisputed evidence clearly demonstrates a trespassory violation

of the Fourth Amendment.

In addition to the entry, Mr. Planer was seized. The Ninth Circuit has used five factors to aid in determining whether an individual is seized. These are:

> (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.

*Washington*, 387 F.3d at 1068 (citation omitted).

Two officers, Sergeant Sampson and Officer Johnson, responded to the apartment building and contacted Mr. Planer. Both officers wore uniforms and carried weapons. The officers did not leave, even after Mr. Planer had told them to leave and shut the door on them. Sergeant Sampson refused to return Mr. Planer's ID to him until Mr. Planer had been served with the citation. Sergeant Sampson told Mr. Planer that he could either go down to Officer Johnson's vehicle to receive the citation, or stay in his apartment, and that Sergeant Sampson would stay with him. These factors strongly indicate that Mr. Planer was in fact seized.

Further, Sergeant Sampson testified in his deposition that he had *Terry* stopped Mr. Planer inside of Mr. Planer's own apartment, and Mr. Planer was not allowed to leave. Sampson Dep. at 80:9-90:5. A *Terry* stop is a temporary stop that, due to its less severe degree of intrusiveness than a traditional arrest, requires

reasonable suspicion, rather than probable cause. *U.S. v. Guzman-Padila*, 573 F.3d 867, 876 (9th Cir. 2009).

"The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause *and* are presented with exigent circumstances." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000) (emphasis original). A physical entry into the home "is the chief evil against which the wording of the Fourth Amendment is directed." *Frunz v. City of Tacoma*, 468 F.3d 1141, 1142 (9th Cir. 2006). A "physical invasion of the structure of the home, 'by even a fraction of an inch' [is] too much." *Kyllo v. U.S.*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. U.S.*, 365 U.S. 505, 512 (1961)).

Sergeant Sampson did not have a warrant, nor were there any exigent circumstances that justified entering Mr. Planer's apartment. Mr. Planer never consented to entry. The evidence demonstrates that Sergeant Sampson did enter Mr. Planer's apartment. Though the entry may have been minimal, it is still violative of the Fourth Amendment.

Further, "the reasons that gave rise to the rule in *Terry* are simply not applicable to a warrantless entry to seize a person within his home." *LaLonde*, 204 F.3d at 955. The *Terry* exception does not apply to searches and seizures within the home. *U.S. v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010). By effectuating a

*Terry* stop on Mr. Planer in his own apartment, Sergeant Sampson performed an unlawful seizure.

Sergeant Sampson violated Mr. Planer's Fourth Amendment rights by unlawfully entering and seizing Mr. Planer.

**2. Plaintiffs can Proceed on a Survivorship Action, but are Limited on Recoverable Damages**

Defendants argue that Mr. Planer's claims related to Sergeant Sampson's unlawful seizure of Mr. Planer do not survive. The Plaintiffs identify two avenues to maintain these claims: (1) that, like the Court decided in *Van Orden v. Caribou Cnty.*, 2011 WL 841438 (D. Idaho Mar. 4, 2011), preclusion of these claims would frustrate the purpose of § 1983; or (2) the cause of action survives under I.C. § 5-237(2).

*a. Superseding Cause*

In 1983 actions,

> the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action.

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

The Idaho Supreme Court "has clearly held that § 1983 is a personal cause of action . . . . At common law in Idaho, a personal tort cause of action abates with

the death of the plaintiff." *Hoagland v. Ada Cnty.*, 303 P.3d 587, 596 (Idaho 2013). Even so, "more recent decisions in this District have consistently concluded that Idaho's rule of abatement conflicts with § 1983's purposes and, therefore, survivors may bring a § 1983 claim where a constitutional violation results in the death of the claimant." *Blankenship v. McDevitt*, 2015 WL 4944395 at *4 (D. Idaho Aug. 19, 2015) (citations omitted).

Defendants argue that the unlawful entry and seizure cannot be considered to have resulted in the death of Mr. Planer, as Mr. Planer brandishing the knife was a superseding cause. The Court agrees.

Superseding cause in the context of a 1983 action is evaluated under the principles of tort law. *See Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1081 (9th Cir. 2018). "Something is a superseding cause only if it is 'a later cause of independent origin that was not foreseeable.'" *Id.* (quoting *Exxon Co. v. Sofec*, 517 U.S. 830, 837 (1996)). Foreseeability is the touchstone of proximate cause in a § 1983 action. *Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 817 (9th Cir. 2023) (citation omitted).

Mr. Planer's actions were a superseding cause. Mr. Planer's actions prompted a neighbor to call the police and report a disturbance. When Sergeant Sampson first knocked on the door of Unit 302, he announced himself as a police officer. He and Officer Johnson were both dressed in Pocatello Police Department

uniforms. Mr. Planer answered his door after Sergeant Sampson knocked on it and called out "police department." When Mr. Planer opened the door, Sergeant Sampson identified himself as such. Sergeant Sampson informed Mr. Planer that he and Officer Johnson were responding to a disturbance call.

Throughout the entirety of Sergeant Sampson and Mr. Planer's interaction leading up to the fatal shooting, Sergeant Sampson did not threaten Mr. Planer with violence. The two men certainly had a testy, contentious exchange, which included Sergeant Sampson raising his voice at Mr. Planer and telling Mr. Planer to stop talking and sit down, as well as Sergeant Sampson stating that he would not return Mr. Planer's ID until the citation was served. But Sergeant Sampson had no reason to draw his weapon and fire until Mr. Planer grabbed and raised a knife. Nor is there any indication that Sergeant Sampson had any intent or thought to use violence until then.

While Sergeant Sampson did violate Mr. Planer's Fourth Amendment rights, Mr. Planer brandishing a knife was not a foreseeable consequence of that violation. Proximate cause is a question of "whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018) (citation omitted). The violation in this case entailed Sergeant Sampson standing over the threshold of Mr. Planer's apartment and conducting a *Terry* stop of Mr.

Planer in his apartment. Even though Fourth Amendment rights in the home are "first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), pulling a knife under these circumstances is, in retrospect, an abnormal or extraordinary act. *See Mendez*, 897 F.3d at 1081-82 (citing Restatement (2d) of Torts § 443 cmts. b, c (Am. Law Inst. 1981).

In addressing causation, the parties rely on two different cases— *Sabbe*, 84 F.4th at 817, and *Mendez*, 897 F.3d at 1076—to support their position. While the defendants rely on *Sabbe,* the plaintiffs argue that *Sabbe* is distinguishable because there the decedent had a rifle. However, that is a distinction without a difference. It goes without saying that a stab or slash from a knife can be just as lethal as a gunshot. Mr. Planer was four to five feet from Sergeant Sampson—well within range to make contact with the knife. Sergeant Sampson was functionally boxed in, with his only path of escape requiring him to pass by Mr. Planer's doorway.

Plaintiffs argue that this case is more similar to *Mendez* than it is to *Sabbe*. However, this case is distinguishable from *Mendez*. In *Mendez*, officers unlawfully entered the one-room home occupied by two individuals, who were asleep at the time the officers entered. *Mendez*, 897 F.3d at 1072. The entry awoke one of the individuals, who picked up a BB gun up from the futon that he was sleeping on in order to place it on the floor. *Id*. The deputies shot the individuals. *Id*. at 1071-72.

The Ninth Circuit affirmed the district court's rejection of the deputies' argument that the individual picking up the BB gun was a superseding cause, noting that a homeowner moving an ordinary item—including a kitchen knife—in an ordinary way that police mistakenly believe to pose a threat cannot be considered superseding cause. *Id.* at 1081. The Ninth Circuit noted that the "possibility of misperceiving a threat is among the reasons why entry into a home by armed police officers with weapons drawn is dangerous . . . there is nothing extraordinary about the possibility that officers might mistake an innocent implement for a threat." *Id.*

However, there are key factual differences between this case and *Mendez*. The deputies entering the home in *Mendez* had no reason to believe that the occupants knew that the people entering his home were in fact deputies. *Id.* He did not deliberately aim the BB gun at the officers, but was "moving the gun, seemingly so he could rise." *Id.* As noted above, Sergeant Sampson made himself known at the start of the interaction—his presence and identity was not a sudden surprise. Additionally, Mr. Planer did not simply pick up the knife, as if to place it on a drying rack or wash it. Rather, he grabbed it and abruptly raised it to shoulder height.

This precludes the Plaintiffs from pursuing their claims for unlawful entry and seizure in accordance with the District Court's practice of permitting § 1983

claims to continue if they result in the death of the claimant. Their alternate statutory authority, I.C. § 5-237(2), remains.

*b. I.C. § 5-327(2)*

Plaintiffs then argue that I.C. § 5-327(2) permits a survival claim. This section states:

> A cause of action for personal injury or property damage caused by the wrongful act or negligence of another shall not abate upon the death of the injured person from causes not related to the wrongful act or negligence. Provided however, that the damages that may be recovered in such action are expressly limited to those for: (i) medical expenses actually incurred, (ii) other out-of-pocket expenses actually incurred, and (iii) loss of earnings actually suffered, prior to the death of such injured person and as a result of the wrongful act or negligence.

*Id*.

Plaintiffs argue that a § 1983 claim is one for personal injury. The question is whether Plaintiffs' claims for unlawful entry and seizure amount to a cause of action for personal injury. In *Wilson v. Garcia*, 471 U.S. 261 (1985), the Supreme Court faced the question of how to characterize § 1983 claims under state statutes of limitations. The Supreme Court determined that all § 1983 claims must be characterized uniformly, because not every claim would have a perfectly analogous counterpart in state law. The Supreme Court held that § 1983 claims were best characterized as personal injury actions.

The Idaho Supreme Court has, indirectly, indicated that "personal injury" as used in the statute has a broad definition. *See Bishop v. Owens*, 272 P.3d 1247,

1250 (Idaho 2011) ("The Idaho legislature addressed whether negligence claims abate in amending I.C. 5-237(2) to provide that negligence claims, including legal malpractice claims, do not abate on the death of the injured person").

In light of this, the Court concludes that "a cause of action for personal injury" brought under § 5-237(2) includes the § 1983 claims for unlawful entry and seizure brought by Plaintiffs.

However, this statute provides for only very limited, specified damages—medical expenses actually incurred, other out-of-pocket expenses actually incurred, and loss of earnings actually incurred prior to the death of the injured person, and as a result of the wrongful act. I.C. § 5-327(2); *see also Estate of Murphy by and through Murphy v. U.S.*, 2018 WL 2107182 at *2-3 (D. Idaho May 7, 2018). Plaintiffs argue that the Court should still apply the *Van Orden* reasoning to conclude that these claims should not be limited to the extremely narrow damages that can be recovered under § 5-327(2).

This District was faced with the question of whether § 5-327(2) applied, and its limitation on damages should be disregarded, in the context of a claim for violations of the Fair Housing Act, 42 U.S.C. §§ 3601 et. seq., in *Community House v. City of Boise*, 2012 WL 3686001 (D. Idaho Aug. 24, 2012). Like a § 1983 action, § 1988 governed, and the Court analyzed the question under the *Van Orden* framework. *Id*. at *2.

Section 1988 establishes a three step analysis:

> First, the Court determines whether the issue before it is addressed by federal law. Absent a federal statute, the Court next examines whether the law of the forum state addresses the issue. Finally, the Court considers whether application of state law would conflict with the policies underlying the cause of action before the Court.

*Van Orden*, 2011 WL 841438 at *2.

As was the case when the Court decided *Van Orden* fifteen years ago, there is no federal statute governing survivorship of § 1983 claims. In *Community House*, the Court determined that § 5-327(2) did not apply because the plaintiff was claiming damages not contemplated by the statute, and the claim was not brought by the personal representative or the heirs. *Community House*, 2012 WL 3686001 at *3. Plaintiffs avoid those pitfalls. The final question then is whether the application of state law would conflict with the policies underlying § 1983.

If the Court applies § 5-327, Plaintiffs are left with, at most, a de minimis recovery of damages for a violation of the Fourth Amendment. However, as the Supreme Court has noted:

> despite the broad sweep of § 1983, we can find nothing in the statute [at issue] or its underlying policies that indicate that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship . . . . It is therefore difficult to see how any of § 1983's policies would be undermined if [decedent's] action were to abate. The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate.

*Robertson v. Wegmann*, 436 U.S. 584 (1978).

This situation is more like the one addressed in *Robertson* than in *Van Orden*. Critically, the wrongful act at issue here is cabined only to the unlawful entry and seizure. *cf. Valenzuela v. City of Anaheim*, 472 F.3d 1141, 1102-03 (9th Cir. 2007) (California statute precluding loss of life damages contradicted purpose of § 1983 where "[death] caused by a violation of federal law"). It is not a case where "the killing is the unconstitutional act" or "where a constitutional violation results in the death of the claimant." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 (7th Cir. 1984); *Blankenship*, 2015 WL 4944395 at *4. Unlike in *Van Orden*, there is a statute that provides for survivorship of personal injury actions. The issue is that the categories of damages provided in that survivorship action are notably limited—an even more favorable situation than that in *Robertson*, where Louisiana law forbade the substitution of the personal representative for the plaintiff and resulted in the wholesale abatement of the claim. *Robertson*, 436 U.S. at 591-92.

Although it severely curtails any damages that Plaintiffs may recover, the strict enumeration of contemplated damages provided in I.C.§ 5-327(2) is not inconsistent with the policies underlying § 1983. Though certainly limited, a § 1983 action meant to enforce the statute's policies of "compensation for and deterrence of unconstitutional acts committed under state law," *Bell*, 746 F.2d at

1239, is still feasible under Idaho state law. Plaintiffs' damages are limited to those allowed by § 5-327(2).

*c. Qualified Immunity*

Government actors are shielded from § 1983 liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court evaluates whether the conduct violated a constitutional right, and whether that right was clearly established at the time of the incident. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

As discussed above, Sergeant Sampson's conduct violated constitutional rights by entering Mr. Planer's apartment and seizing him by conducting a *Terry* stop within his own apartment. The question then is whether these rights were clearly established at the time of the incident. They were.

"Qualified immunity insulates the officers from liability unless existing precedent has placed the statutory of constitutional question beyond debate." *C.B. v. City of Sonora*, 769 F.3d 1004, 1034 (2014) (Smith, J., concurring in part) (cleaned up and citations omitted). Neither solely probable cause, nor the reduced *Terry* standards, allow an officer to enter a person's home without a warrant. *LaLonde*, 204 F.3d at 954-55. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). The

Ninth Circuit has clearly rejected the notion that the less-stringent standards of a *Terry* stop can be used to seize an individual in their own home. *La Londe*, 204 F.3d at 954-55; *see also U.S. v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005); *U.S. v. Crapser*, 472 F.3d 1141, 1149 (9th Cir. 2007).

*d. Chief Schei and the City of Pocatello*

Plaintiffs also allege that Chief Schei and the City of Pocatello are liable for "Sergeant Sampson's unconstitutional conduct which is attributable to policies, practices, and or decisions of [Chief Schei and the City of Pocatello] or a failure to adopt polices necessary to prevent its officers from engaging in unreasonable searches and seizures." Cmpl. at ¶¶ 133, 148. The Court will dismiss these allegations against the City of Pocatello, but not summarily decide Plaintiff's claim against Chief Schei in favor of either party.

If Plaintiffs are attempting to bring these claims against the City of Pocatello under a theory of respondeat superior, they are barred from doing so. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). If it is a *Monell* claim, it is duplicative of Plaintiff's eighth and ninth claims.

As to Chief Schei, "[a] supervisor can be held liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of

others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998). A supervisor may be liable under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). A sufficient causal connection may be demonstrated through "evidence that the supervisor implemented a policy so deficient that the policy itself is a repudiation of constitutional rights." *Id*. (cleaned up and citation omitted).

Though Plaintiffs do not directly argue in their motion that Chief Schei is individually liable, they do point to evidence from which a jury could reasonably infer that Chief Schei was culpable regarding training, supervision, or control. Sergeant Sampson testified that Chief Schei delegated training down to captains and lieutenants, who in turn delegated down the chain to sergeants. Sampson Dep. 23:10-17. Sergeant Sampson further testified that sergeants oversaw picking the legal topics to conduct training on. *Id*. Such a training regimen may mean that topics, at a sergeant's discretion, are missed, under-emphasized, or handled imprecisely. Additionally, Chief Schei repeatedly affirmed that officers can effectuate a *Terry* stop on someone inside of their own home, and that Pocatello officers are trained as such. Schei Dep. 53:13-25, 70:24-71:1 (Dkt. 27-3).

However, because the Plaintiffs do not develop their arguments as to Chief Schei's individual liability but rather bring this evidence up in discussing their *Monell* claims, they have not demonstrated Chief Schei is individually liable as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Defendants also focused on Chief Schei's testimony in the context of Plaintiffs' *Monell* claims. Thus, they have not met their burden either. *Id*.

**D. The Training and the Policies of the Pocatello Police Department were Deliberately Indifferent to Mr. Planer's Rights Against Unlawful Entry and Seizure**

Plaintiffs bring two *Monell* claims, for failure to train and lack of a policy, or alternatively, an unconstitutional policy. [6]

An individual may prevail in a § 1983 action against municipalities . . . if the unconstitutional action implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 740 (9th Cir. 2020) (quotations and citations omitted). "A *Monell* claim requires the plaintiff to establish (1) deprivation of a constitutional right; (2) the municipality had a policy (3) the policy

[6] Plaintiffs' Complaint asserts *Monell* claims against the "Supervisor Defendants" in Counts Eight and Nine. Dkt. 4 at ¶¶ 170-193. While it appears that Plaintiffs meant to bring these claims only against the City of Pocatello, the Court will clarify that these claims are dismissed against Chief Schei. *See Tuinstra v. Bonner Cnty.*, 2021 WL 2534983 at *4 (D. Idaho June 21, 2021).

amounted to deliberate indifference to the constitutional right; and (4) the policy was the moving force behind the violation. *Id*. at 741.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of a failure to train, though there exists a narrow range of circumstances in which a pattern of similar violations might not be necessary to show deliberate indifference." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (cleaned up) (citations omitted). This narrow range is where "there need for more or different training [is] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can be reasonably said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

The underlying constitutional right that Mr. Planer was deprived of was his Fourth Amendment right to be free from unlawful seizure. The next element is whether Pocatello had a training policy that Mr. Planer's constitutional deprivation can be traced to. This policy must amount to deliberate indifference to constitutional rights. The training that Pocatello Police received does so. The

Plaintiffs did not demonstrate a pattern of similar violations; even so, the department's training on *Terry* stops fits into the narrow range described in *Canton*.

In his deposition, Sergeant Sampson testified that his team tries to do two case law reviews per week, as well as one policy review per week. Sampson Dep. 14:19-15:9. Case law reviews cover topics including the Fourth Amendment, *Terry* stops, and warrantless arrests. *Id*. at 17:13-17. Specifically, this training includes cases such as *Graham v. Connor*, *Minnesota v. Dickerson*, *Maryland v. Wilson*, and *Pennsylvania v. Mimms*. *Id*. at 44:12-45:6. Sergeant Sampson is in charge of this training for his team. *Id*. at 15:16-19.

He further testified that the Pocatello Police Department trains his officers, and he himself trains his team, that a *Terry* stop can be conducted in any circumstance—including when an individual is inside of their residence—so long as an officer has an articulable reasonable suspicion of a crime. *Id*. at 51:15-52:22; 98:19-99:4. Officer Johnson and Chief Schei, Pocatello's Rule 30(b)(6) witness, also testified that, pursuant to Pocatello Police Department training and policy, an officer can effectuate a *Terry* stop on an individual within their own home. Johnson Dep. 56:5-7; Schei Dep. 59:21-25. Sergeant Sampson stated that he conducted a *Terry* stop of Mr. Planer while Mr. Planer was inside his apartment. Sampson Dep. 88:23-90:5.

This deficiency in policy and training is so obvious, and so likely to result in a constitutional violation, that Pocatello was constructively or actually on notice of the need for different training. As discussed above it is well-settled in the Ninth Circuit that *Terry* stops within the home are clear violations of the Fourth Amendment. Officers regularly talk to individuals at the doorway of their residence. In this case, policymakers were deliberately indifferent to the need for different training.

For the same reason, as a matter of law, the Plaintiffs have demonstrated *Monell* liability for the department's policies regarding *Terry* stops. The department's policies established that temporary detentions were "left to the officer based on the totality of the circumstances, officer safety considerations, and constitutional safeguards." Pls.' Mem. Supp. Summ. J. Ex. H at 348 (Dkt. 27-8). Regarding searches and seizures, the policy stated that "each member of this department is expected to act in each situation according to current training with clearly established rights as determined by case law." *Id*. at 141. While Sergeant Sampson identified particular cases training discussed, the policies adopted by the department left decisions regarding *Terry* stops and searches and seizures to the discretion of the officers. Given that Sergeant Sampson, Johnson, and Schei all testified that an officer could effectuate a *Terry* stop on someone within their home, these policies resulted in deliberate indifference to constitutional rights.

### E. Failure to Intervene

Defendants also moved for the Court to summarily decide that Officer Johnson was not liable as a matter of law for failing to intervene in Sergeant Sampson's alleged infringement of rights. Defendants' argument is premised on their position that Sergeant Sampson is not liable for any constitutional violations alleged, and therefore Officer Johnson cannot be liable for not intervening. Beyond that argument, neither party addresses this claim in their subsequent briefing, and Plaintiffs did not move for summary judgment on this claim.

Because the Court grants summary judgment in favor of Plaintiffs on their unlawful entry and seizure claims, Defendants' argument necessarily fails. Additionally, Officer Johnson is not entitled to qualified immunity as to this claim for the same reasons that Sergeant Sampson is not, discussed above. Therefore, summary judgment is denied as to Count Ten.

## ORDER

**IT IS ORDERED that:**

1. Defendant's Motion for Summary Judgment (Dkt. 25) is **GRANTED** as to Counts One, Two, Three, Four, Seven, and **DENIED** as to Counts Five, Six, Eight, Nine, and Ten.

2. Plaintiff's Motion for Summary Judgment (Dkt. 26) is **GRANTED** as to Counts Five, Six, Eight, and Nine, and is **DENIED** as to Count Seven.

DATED: August 31, 2026

B. Lynn Winmill
U.S. District Court Judge